UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GINA GUILLEN,

                Petitioner,

      -against-

                                          **MEMORANDUM & ORDER**

WILLIAM POWERS, Superintendent,                  07 CV 5348
    Albion Correctional Facility,

                Respondent.
-----------------------------------------------------------X
DEARIE, Chief Judge.

For the reasons set forth below, the application of petitioner Gina Guillen for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) is denied and the petition is dismissed.

## DISCUSSION

A.    <u>State Proceedings</u>

Petitioner was convicted in May 2005, after a jury trial, of assault in the first degree and criminal possession of a weapon in the fourth degree (a misdemeanor). Petitioner testified that on the morning of April 29, 2003, she delivered several non-fatal blows with the claw-end of a hammer to the head of her then-boyfriend Felipe Herrera (whom she later married), but claimed that she did so in self-defense. Petitioner was also charged with second degree attempted murder, but the jury was unable to reach a verdict on that count.

Petitioner was sentenced to seven years on the assault conviction and a concurrent, one-year term on the weapons count. The Appellate Division unanimously affirmed the conviction, People v. Guillen, 37 A.D.3d 852 (2d Dep't 2007), and the New York Court of Appeals denied leave to appeal. People v. Guillen, 9 N.Y.3d 865 (2007).

Petitioner's grounds here on habeas are the same she asserted on her direct appeal in state court, *viz.*, that the state failed to disprove her defense of justification beyond a reasonable doubt, and that her conviction is against the weight of the evidence. As she did at trial and on appeal, petitioner argues that because the victim did not testify, her plausible account of self-defense, left uncontradicted, was necessarily not disproven beyond a reasonable doubt.[1] The Appellate Division unanimously rejected these assertions. Guillen, 37 A.D.3d at 852. Noting that "resolution of issues of credibility is primarily a matter to be determined by the jury, which saw and heard the witnesses," and that the jury's "determination should be accorded great deference," the Appellate Division concluded that "the defense of justification was disproved beyond a reasonable doubt." Id.. The court further declared that "[u]pon the exercise of its factual review power" under New York Criminal Procedure Law § 470.15, it was "satisfied that the verdict of guilt was not against the weight of the evidence." Id.

B. Standard of Review

The "circumstances under which [the Court] may grant the writ are *strictly limited* to those where an adjudication on the merits in state proceedings 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" or involved an unreasonable determination of the facts in light of the evidence presented. Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (*quoting*, 28 U.S.C. § 2254(d)) (emphasis added). See also Carey v. Musladin, 549 U.S. 70, 74 (2006) (habeas relief available only if state court decision "was

---

[1] Petitioner appears here *pro se*, but her application incorporates the brief submitted on her behalf to the Appellate Division, prepared by appointed counsel.

contrary to or involved an unreasonable application of *this* Court's applicable *holdings*") (emphasis added); Williams v Taylor, 529 U.S. 362, 412 (2000) (federal law in section 2254(d) "refers to the *holdings* . . . of *this* Court's decisions"); Lockyer v. Andrade, 538 U.S. 63, 75 (2003) ("[t]he 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous;" it must be "objectively unreasonable"). In addition, a state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

Inasmuch as the state must prove lack of justification,[2] we treat petitioner's claim as a challenge to the sufficiency of the evidence supporting her conviction, and she thus bears a "very heavy burden." Ponnapula, 297 F.3d at 179. When assessing a claim of insufficiency, the Court must review the evidence in the light most favorable to the state. Jackson v. Virginia, 443 U.S. 307, 326 (1979). On the thorny subject of inferences, the Supreme Court has all but removed the guesswork, explaining quite clearly that:

> [A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences *must presume*—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and *must defer* to that resolution.

443 U.S. at 326 (emphasis added).

To measure sufficiency, a federal habeas court of course "must look to state law to

---

[2] See People v. McManus, 67 N.Y.2d 541, 546-47 (1986) (justification is a full defense that "does not operate to excuse a criminal act [or] negate a particular element of a crime" but "renders such conduct entirely lawful;" the state therefore "must prove its absence to the same degree as any element of the crime charged"); N.Y. Penal Law § 35.00 (justification is an ordinary defense, not an affirmative one).

-3-

determine the elements of the crime," Ponnapula, 297 F.3d at 179 (internal citation omitted), and must uphold the conviction "if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original).

Notably, petitioner does not dispute that, absent the defense she interposed, the elements of first-degree assault were established.[3] She also does not challenge the accuracy of the trial court's instructions on justification which, in response to jury notes, were twice re-read after the initial charge. See Tr. 1280-85 (elements of justification and state's burden); 1286-87 (justification as defense to first degree assault); 1303-1309 (first re-reading of elements of justification); 1320-25 (second re-reading of elements of justification). Finally, petitioner does not claim that her opportunity to present her defense theory was curtailed in any material respect. Her claim that the state failed to disprove that she was justified in using deadly force therefore presents a narrow evidentiary question.[4] As applied here, Jackson requires that the petition be denied unless *no* rational juror could have found petitioner's use of deadly force unjustified.

C.   Justification under New York Law

The relevant justification provision of the New York penal code provides that, "[a] person may . . . use physical force upon another person when and to the extent he or she reasonably

---

[3] Under New York law, a person is guilty of assault in the first degree when, with intent to cause serious physical injury to another person, she does cause such injury to that person by means of a deadly weapon or dangerous instrument. See N.Y. Penal Law § 120.10(1).

[4] The justification defense is not applicable to misdemeanor weapons possession offenses. See, e.g., People v. Pons, 68 N.Y.2d 264 (1986). Petitioner's argument to the contrary, based on the premise that under the circumstances of this case, the hammer was "not a per se weapon," see Pet'r State App. Br. at 16, is unavailing. In any event, even if the defense of justification were, in theory, applicable to the weapons count for the reasons petitioner suggests, the Court's evidentiary treatment of the justification claim applies equally to petitioner's claim with respect to the weapons count.

believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person." N.Y. Penal Law § 35.15(1). The statute further provides, however, that a person "may not use deadly physical force" unless the actor "reasonably believes that such other person is using or about to use deadly force," and that "[e]ven in such case. . . the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others[,] he or she may avoid the necessity of so doing by retreating." Id., subpar.(2).[5]

D.  The Critical Portions of the Record

In essence, the petition calls upon the Court to determine whether the assault conviction can stand in the face of petitioner's testimony, which fills more than 200 pages of the trial transcript (see T. 704-926) and addresses both the circumstances of the assault and the details of a domestic relationship that petitioner claims was abusive. Petitioner's testimony was buttressed by the opinion of a domestic violence expert who testified, *inter alia*, that "battered women" typically remain with their abuser, suffer from denial, and are conditioned to believe that it is normal for men to hit their girlfriends or spouses.

1.  Petitioner's Self-Defense Testimony

Petitioner testified that, at around 4:30 on the morning of April 23, 2003, as she arrived home from her job in a nightclub, she received a telephone call from a woman named Leo, the ex-girlfriend of Herrera (and the mother of his two children). Leo asked petitioner to come pick

---

[5] The comprehensive justification provisions address other concepts and circumstances not applicable to the facts here. See generally Donnino, Practice Commentary, McKinney's Cons. Laws of N.Y., Book 39, Penal Law, Art. 35, 2009 Pocket Part at 81 et seq.

up Herrera, who was at her apartment, drunk. While talking to Leo, petitioner heard Herrera in the background yelling profanities. Petitioner felt "very bad," "angry," and "jealous," T. 760-61, that Herrera was with Leo, but she asked Leo for her address, phoned for a taxi, and went to Leo's apartment.

When petitioner arrived at Leo's apartment, she found Herrera, drunk, in the back of the apartment. Leo and several other adults were also there. Herrera was angry with petitioner for having shown up at Leo's. He was also argumentative with Leo and the others. Petitioner did not understand the Spanish being spoken, but believed these other people were making fun of her.

Petitioner and Herrera continued to argue in the short taxi ride back to Herrera's apartment. Petitioner was angry with Herrera because, even though she knew that Herrera had gone to see Leo on other occasions, this was the first time he was so drunk that petitioner had to go pick him up. T. 766.

When they reached Herrera's apartment, Herrera's roommate Luis Patricio Guzman was there, laying on his bed, but dressed and awake. Petitioner wanted to have a conversation with Herrera about Leo, their relationship, and Herrera's drinking (specifically, she wanted to discuss why he was drinking on a Monday when they had a plan in place to limit his drinking to weekends). But petitioner also wanted Guzman to leave before she started her conversation with Herrera because she felt that petitioner behaved differently in front of his friends. She stated that in front of Guzman, Herrera would "act like nothing happen [sic]," and "more possessive" and "in command," whereas when she was alone with him he would be "more soft, more lovely, talk very slow." T. 773. She also said that he was "totally different" when he was drunk, and would

"act[] like . . this is my room, this is what I do, this is his way." T. 774. Petitioner eventually gave Guzman money to leave, and he departed.

Herrera and petitioner then resumed their argument. Petitioner told Herrera that if he really wanted to be with Leo then he should just go and not come back. She also stood in the doorway and pretended that she was about to leave. Herrera then grabbed a razor and began to cut his wrists to thwart her departure, saying that she should not believe anything Leo said and that she could not leave him. When petitioner then approached Herrera to try to stop him from cutting himself, he stood up and began to attack her. She testified that Herrera first pulled her hair, and then, holding her by the hair, threw her down to the floor and pulled her back up, repeatedly and hard. T. 780-81. This all happened quickly; she estimated that Herrera threw her down several times, and also punched her head and her chest. Petitioner stated that she had initially been afraid for Herrera, while he was cutting himself, but then became afraid for herself; she testified that he was "doing it very hard," and "was more angry, more drunk than ever." T. 784.

There then came a point where petitioner was able to grab a hammer and hit Herrera with it as he continued to punch her. T. 783-84. Petitioner was asked, "What happened next?" and responded, "And I remember that I took the hammer with my right hand at one point. I don't remember exactly when." T. 783. She testified that she saw the hammer under the television; when asked whether she was standing up or laying down at that point, petitioner testified, "I don't remember, but I remember that I was able to take it with my hand." T. 783. Petitioner struck Herrera with the tool because she "wanted him to get out" and "get away from [her]." After she struck him the first time, he "kept moving" and "kept being like [she] didn't hit him,"

so she hit him several more times. Petitioner could not recall how many times Herrera continued to hit her after she first struck him with the hammer, but he eventually did stop, when he fell—near the bed, but not over or on it. Petitioner then used a sheet and a towel to try to absorb the blood; Herrera kept trying to get up, and petitioner tried to hold him, which made her clothes bloody.

2. Petitioner's Testimony about Her Relationship with Herrera

According to petitioner, Herrera became jealous and possessive soon after the couple began dating in 2001. He frequently started fights with other men when they socialized, and sometimes hid her clothes to keep her from going out. T. 711-12. Herrera eventually became physically abusive on a regular basis; petitioner described a series of beatings petitioner inflicted with his hands or belt, and said that they usually happened on the weekends because that was when Herrera was usually drunk. Only two such instances of abuse occurred in front of others.

Initially petitioner did not view these incidents as a "big deal," testifying that she used to believe that "men always hit a woman." (T. 738). Petitioner often had sex with Herrera after the beatings, when he would suddenly become very gentle. Sometimes, though, she did not want to have relations with him and he would force himself on her, but she did not think he was doing anything wrong. T. 743.[6]

3. The Domestic Violence Expert

Dr. Evan Stark, an expert in the field of domestic violence, testified that "battery" in the domestic violence context involved not only physical violence but a course of conduct that

---

[6] Several months after the event leading to her arrest, in November 2003, petitioner married Herrera.

-8-

includes patterns of isolation, intimidation "and, most importantly, control." T. 993-94. Dr. Stark emphasized that the cumulative effect of these patterns can cause battered women, who are often in denial, to feel they are trapped and have limited options. Stark also opined that alcohol abuse is the foremost risk factor contributing to domestic violence. T. 995-1003.

E.  Discussion

The crucial flaw in petitioner's assertion is this: the fact Herrera did not testify and that no other witnesses offered a version of events directly rebutting petitioner's does not mean that the jury did—or that any rational juror had to—accept petitioner's account in its entirety. To the contrary, a rational juror asked to conclude on the basis of petitioner's testimony that her conduct was entirely lawful (i.e., "justified") might well have found, within that testimony itself, reasons to discount or discredit the self-defense claim. (Absent that claim, as stated above, there is no dispute here that the elements of first degree assault were established beyond a reasonable doubt.)

We reiterate that, in order to grant relief, we would have to conclude that *no* rational juror could have rejected petitioner's defense, and so the question we ask is not whether a rational juror *had* to reject the self-defense claim, but whether a rational juror *could have* done so and therefore found petitioner's use of force unjustified. It is the latter question that we answer in the affirmative.

Beginning where petitioner does, with the telephone call from Leo, a rational juror could have concluded that petitioner's conduct was *in*consistent with the behavior of the battered woman with limited or no choices described by Dr. Evan and, by extension, that her uncorroborated account of self-defense should not be credited. For example, one rational view of

petitioner's account is that she acted quite determinedly and unafraid in not saying no to the request that she take herself out at five o'clock in the morning to retrieve her drunken, abusive boyfriend from his ex-girlfriend's apartment.[7] It is also rational to infer, from petitioner's ensuing account, that petitioner continued to behave contrary to her defense: (1) when she succeeded in getting the drunken, combative Herrera out of Leo's apartment and into a taxi; (2) when she then insisted upon confronting Herrera about their relationship and his drinking right then and there, when he was already drunk, angry and combative, rather than waiting until he slept it off; and (3) when she took the step of paying Herrera's roommate to leave so that she could confront Herrera privately.

For these same reasons, a rational juror could have found, as the prosecution argued, that petitioner's actions were deliberate and planned, rather than exigent. There was, likewise, evidence from which a rational juror could infer actual motive: petitioner's admission that retrieving her drunken boyfriend from his ex-girlfriend's apartment made her feel angry, jealous, and humiliated.

Portions of petitioner's testimony were also in conflict with the state's evidence, and a rational juror was entitled to resolve these conflicts in favor of the prosecution; indeed, on habeas, this Court "must presume" that the jury in petitioner's case did precisely that, "and must defer to that resolution." Jackson, 443 U.S. at 326. A crucial state witness with whom

---

[7] Given the delicacy of any discussion bearing on domestic abuse, it bears reiterating that the same conduct could *also* have been rationally viewed as a manifestation of precisely the blind, stubborn loyalty that, according to Dr. Evan, battered women often show, or could likewise reveal that petitioner was too afraid *not* to pick Herrera up when asked to do so, even though the request did not come from him directly. The sufficiency question on habeas, however, is only whether a rational inference rejecting the defense (and thus supporting the conviction) was *available*.

petitioner's testimony was in conflict was Herrera's roommate Guzman. Guzman confirmed that Herrera was "very drunk" when he arrived home with petitioner. He also testified, however, that he helped petitioner put Herrera to bed and that when he left the apartment, Herrera *was asleep*, not awake, as petitioner claimed. T. 401-406.

Guzman also furnished an additional basis upon which a rational juror could infer planning and deliberate action on petitioner's part. He testified that petitioner "insisted" that he leave, that she at first gave him forty dollars, that he said it was too little because he would need a hotel room, and that petitioner then paid him an additional twenty dollars to leave. T. 404. Guzman also testified that by the time he left, petitioner was calm and seated. T. 406. Jurors could reasonably draw from this evidence—of petitioner's apparent eagerness to secure Guzman's absence and of her non-agitated state shortly before the stabbing occurred—inferences that are more consistent with guilt than with justification. Such inferences are even more rationally drawn in light of petitioner's own explanation for why she asked Guzman to depart, which, from the perspective of a rational juror, leaves important questions unanswered: if, as petitioner testified, Herrera was more likely to be abusive when he was drunk, why would petitioner pursue with such determination the goal of being alone with Herrera when he was in that condition, and why would she exacerbate his potential volatility by confronting him, in that condition, about his drunkenness and his relationship with his Leo? Again, the Court must presume that inferences favorable to the prosecution were drawn from these gaps in petitioner's account.

Still other evidence with which a rational juror might be unable to reconcile petitioner's testimony were the photographs of the crime scene, which showed that the pillow at the head of

Herrera's bed was blood-soaked, and that the walls near that part of the bed were blood-splattered. T. 643-53. Petitioner, by contrast, testified that the altercation occurred at the foot of the bed, but not on the bed, and that Herrera eventually fell near but not on the bed. Although responding EMT Julio Lizarazo testified that Herrera was found lying on the floor by the foot of the bed, a detail consistent with petitioner's account of how the attack ended, petitioner could not offer any explanation, much less a rational one, for the blood on the pillow and the walls. T. 893. Once again, the Court must presume that jurors resolved any conflicts in the evidence in favor of the prosecution and drew from that evidence the necessary inferences consistent with guilt, namely, that petitioner struck Herrera deliberately, while he slept, and thus without justification.

Jurors were offered yet another reason for questioning petitioner's uncorroborated account. Lizarazo testified that petitioner had no visible injuries. T. 310. Officer Shawn Hill, who also reported to the scene, testified similarly. T. 369. A rational juror could therefore infer, at the very least, that petitioner had not been struck by Herrera with the severity she claimed, and that her use of force was not objectively reasonable.

For all these reasons, the Appellate Division's decision that justification was disproven beyond a reasonable doubt is not contrary to or an unreasonable application of Supreme Court law, or an unreasonable factual determination in light of the totality of the evidence presented, within the meaning of 28 U.S.C. §2254(d)(1) and (2).

Petitioner's related claim, that her conviction is against the weight of the evidence, is not cognizable on habeas. See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) ("assessments of the weight of the evidence . . . are for the jury and not grounds for reversal on [habeas] appeal"); Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence'

argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15[5]"). Even if we could entertain it, we would find it meritless for the evidentiary reasons already discussed.

## CONCLUSION

For the foregoing reasons, the application is denied and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
April 22, 2009

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge